IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KANSAS STATE UNIVERSITY, and
K-STATE ATHLETICS, INC, formerly
known as THE INTERCOLLEGIATE
ATHLETIC COUNCIL OF KANSAS
STATE UNIVERSITY, INC.,

                          Plaintiffs,

        Vs.                                          No.  09-4112-SAC

RONALD D. PRINCE, and
IPP, L.L.C.,

                          Defendants.


MEMORANDUM AND ORDER

        This case comes before the court on the plaintiffs' motion to remand

this case to state court for lack of federal subject matter jurisdiction. The

case was removed solely on the basis of diversity jurisdiction and asserts

no federal question. The sole issue before the court is whether the case

was properly removed to federal court.

**Background**

        The plaintiffs, Kansas State University (KSU) and K-State Athletics,

Inc, formerly known as the Intercollegiate Athletic Council of Kansas State

University, Inc. (IAC), originally filed this case in state court seeking a

declaratory judgment action that a Memorandum of Understanding (MOU) signed by Ron Prince on behalf of IPP, LLC, and by Robert S. Krause on behalf of IAC, is not a valid or enforceable agreement or that certain provisions are of no force or effect following Prince's termination. The MOU, if valid, obligates the IAC to provide additional sums of money for Prince's benefit in the event Prince is terminated without cause before his contractual term expires.

The controlling facts are undisputed. Prince was employed as the head football coach for Kansas State University from December 5, 2005 until his termination effective December 31, 2008.

**The 2005 agreement**

Prince's first employment agreement, stated to be between the IAC, KSU, and Prince, was for five years, beginning on December 5, 2005. The agreement was signed "for Kansas State University" both by Dr. Jon Wefald as "President" and by Robert S. Krause as "Vice President for Institutional Advancement," and was signed "for IAC" by Tim Weiser as "Athletic Director," all on February 28, 2006. The employment agreement was signed by Ron Prince on December 23, 2006. That contract reserved to KSU the right to terminate Prince's employment at any time without

cause, in which event it agreed to pay Prince stated amounts of money which lessened as the date of termination progressed: $1,200,000 if termination occurred after the 2005-06 contract year; $900,000 if termination occurred during or after the 2006-07 contract year; $600,000 if termination occurred during or after the 2007-08 contract year; and $300,000 if termination occurred during or after the 2008-09 contract year.

The 2005 agreement stated that "Acceptance by Coach of this amount will constitute full settlement of any claim that Coach might otherwise assert against the University, or any of its representatives, agents or employees." The 2005 agreement also contained an integration clause stating:

> With the exception of the provisions of each annual appointment entered into by and between Coach and the University which are hereby incorporated by reference, this Agreement supersedes all prior agreements with respect to the subject matter hereof and constitutes the entire agreement between the parties hereto and may be modified only in a writing signed by the President of the University, the Athletic Director and Coach.

Dk. 9, Exh. 3, p. 14.

### The 2008 agreement

In 2008, a new employment agreement for Prince was executed which "replace[d] and supersede[d] the prior 2005 agreement." Dk. 9, Exh.

2, p.1. The term of this agreement between the IAC, KSU, and Prince was stated to be for five years beginning on January 1, 2008. It reflects that it was executed "for Kansas State University" by Dr. Jon Wefald as "President," and by Ron Prince on January 1, 2008.[1] It was signed "for Kansas State University and the IAC" by Robert S. Krause as "Vice President for Institutional Advancement and Intercollegiate Athletics, Director of Athletics," on August 7, 2008, according to the handwritten date beside his signature. As had the 2005 agreement, the 2008 Agreement reserved to KSU the right to terminate Prince's employment at any time without cause, in which event it agreed to pay Prince the same amounts as stated in the 2005 agreement: $1,200,000 if such termination occurred before December 31, 2009; $900,000 if before December 31, 2010; $600,000 if before December 31, 2011, or $300,000 if before December 31, 2012.

Unlike the 2005 agreement, however, the 2008 agreement did not state that acceptance by Prince of that amount would constitute full settlement of any claim that he might otherwise assert against the University, or any of its representatives, agents or employees. The

---

[1]Defendants' counterclaim asserts that Prince actually signed the 2008 agreement on August 7, 2008, the same date he signed the MOU.

integration clause was also modified from the 2005 agreement, as the 2008

agreement omitted the statement that the agreement "constitutes the entire

agreement between the parties hereto and may be modified only in a

writing signed by the President of the University, the Athletic Director and

Coach." Other differences exist between the 2005 and 2008 employment

agreements, but are immaterial to the issue before this court.

Both the 2005 and the 2008 agreements provide that except for the

obligation to pay Prince the amount set forth in the agreement's provision

relating to termination without cause, all obligations of KSU and/or IAC to

the extent not already accrued or vested, shall cease as of the effective

date of such termination. Dk. 9, Exh. 2, p. 8, § 4.01(a); Dk. 9, Exh. 3, p. 8 §

4.01(b).

**The MOU**

On the same date that Krause signed Prince's 2008 employment

agreement (August 7, 2008) he also signed a separate "Memorandum of

Understanding" (MOU) with a corporation stated to be an LLC named "In

Pursuit of Perfection," (IPP). Krause signed "on behalf of IAC," and Prince

signed "on behalf of IPP." The MOU states that the following amounts from

a Reserve established by the IAC will be paid to IPP "if the owner of IPP is

terminated by IAC without cause during the life of the owner's current

employment agreement with the IAC..." Prince is the owner of IPP.

| Date of termination without cause | Amount to be distributed | Date to be distributed |
|---|---|---|
| 12/31/08 | $800,000 | 12/31/15 |
| | $800,000 | 12/31/16 |
| | $800,000 | 12/31/20 |
| 12/31/09 | $800,000 | 12/31/15 |
| | $800,000 | 12/31/16 |
| | $800,000 | 12/31/20 |
| 12/31/10 | $800,000 | 12/31/15 |
| | $800,000 | 12/31/16 |
| 12/31/11 | $800,000 | 12/31/15 |

Dk. 9, p. 27. The MOU states that its provisions "constitute the entire MOU

which shall be legally binding on both parties." *Id.*

The parties agree that Prince was notified on November 5, 2008 that

he was being terminated as KSU's head football coach, effective

December 31, 2008, that the termination was without cause, and that KSU

paid Prince $1,200,000 as was required by the terms of the parties' 2008

employment agreement. No payment has been made pursuant to the

MOU.

**The lawsuit**

Plaintiffs filed this declaratory judgment action in Riley County, Kansas and served defendants with their First Amended Petition, asking the court solely to:

> ... declare the rights, status, and other legal relations of the parties in the form of a declaratory judgment that the [MOU] is not a valid or enforceable agreement, or that if the [MOU] is not void or unenforceable, its payment provision was not triggered and the [MOU] is therefore of no force or effect following Prince's termination.

Dk. 1, Exh.1, p. 9.

In response, defendants timely removed the case to federal court on the basis of diversity jurisdiction. Defendants then filed counterclaims solely against IAC.[2] These are for: 1) anticipatory repudiation of the MOU, seeking damages in the amount owed under the termination payment provision of the MOU in the amount of $3,200,000; 2) fraudulently inducing Prince to sign the MOU in the event that Krause lacked legal authority to bind the IAC; and, 3) punitive damages for IAC's wanton and malicious anticipatory repudiation of the contract. *Id.* The sole issue currently before the court is whether, as plaintiffs contend, the case was improperly removed to federal court because no diversity jurisdiction exists.

**Diversity jurisdiction/removal**

---

[2]IAC responded by moving to dismiss the counterclaims, claiming Eleventh Amendment immunity. Dk. 13.

"[A]ny action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant ... to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). However, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). "Those who seek to invoke federal jurisdiction must establish its prerequisites." *McPhail v. Deere & Co.*, 529 F.3d 947, 953 (10th Cir. 2008). Federal removal jurisdiction is statutory in nature and is to be strictly construed. *Archuleta v. Lacuesta,* 131 F.3d 1359, 1370 (10th Cir. 1997), citing *Shamrock Oil & Gas v. Sheets*, 313 U.S. 100, 108 (1941). Doubtful cases must be resolved in favor of remand. *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir.), *cert. denied*, 516 U.S. 863 (1995) (noting presumption against removal jurisdiction).

Removal in this case is premised solely on diversity jurisdiction under 28 U.S.C. §1332, which provides that federal courts have original jurisdiction of civil actions where complete diversity of citizenship and an amount in excess of $75,000 in controversy exist. The plaintiffs agree that the defendants accurately state an amount in controversy in excess of the

jurisdictional threshold, but challenge the citizenship of the parties.

> Since an action is not removable from a state to federal court unless it might have been brought originally in a federal court, the basic principles of diversity jurisdiction, such as the requirement of complete diversity between plaintiffs and defendants and the amount in controversy requirement are fully applicable to Section 1441(b).

14A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3723 at p. 306-307 (1985). "Complete diversity" exists when "all parties on one side of the litigation are of a different citizenship from all parties on the other side of the litigation." *Depex Reina 9 Partnership v. Texas Int'l Petroleum Corp.*, 897 F.2d 461, 463 (10th Cir.1990).

Plaintiffs contend that KSU and IAC, as arms or instrumentalities of the State of Kansas, are non-citizens of any state, destroying diversity jurisdiction. Plaintiffs additionally assert that Prince's citizenship and that of his wholly-owned IPP are unsettled based upon the current record. Defendants counter that KSU should be ignored as a party in this case because it has been fraudulently joined for the purpose of destroying diversity jurisdiction, that IAC is a separate, independent corporation whose citizenship is in Kansas, and that defendants Prince and IPP are citizens of the state of Virginia, rendering diversity jurisdiction appropriate. The court

thus examines the citizenship of the parties.

**Kansas State University**

Defendants originally alleged that Kansas State University is a citizen of Kansas. They have subsequently conceded that KSU is an instrumentality of the State of Kansas and is not a citizen of any state for purposes of diversity jurisdiction. Dk. 17, p. 6-7. The court agrees. *See Postal Telegraph Cable Co. v. State of Alabama*, 155 U.S. 482, 487 (1894)); *Innes v. KSU*, 184 F.3d 1275 (10th Cir.1999), *cert. denied*, 529 U.S. 1037 (2000). The State's presence in this suit is not ignored, however. *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973). Rather, if the State of Kansas is the real party in interest bringing this action then its presence destroys diversity jurisdiction, because the statute requires a suit between *citizens* of different states. *Title Guaranty Co. v. Allen*, 240 U.S. 136, 140 (1916).

**Fraudulent joinder**

Defendants invoke an exception to the above rule, contending that KSU is a fraudulently joined party whose citizenship is immaterial. "Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity." *Triggs v. John Crump*

*Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir.1998). In cases removed on the basis of diversity of citizenship, the court does not consider the citizenship of fraudulently joined defendants in determining the existence of jurisdiction. *Updike v. West*, 172 F.2d 663, 665 -666 (10th Cir. 1949), *cert. denied*, 337 U.S. 908 (1949). This "fraudulent joinder" doctrine "effectively permits a district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Mayes v. Rapoport*, 198 F.3d 457, 461-62 (4th Cir.1999) (citations omitted). "Fraudulent joinder is a term of art, which does not reflect on the integrity of plaintiff or counsel, but rather exists regardless of the plaintiff's motives when the circumstances do not offer any other justifiable reason for joining the defendant." *City of Neodesha, Kansas v. BP Corp. N. Am. Inc.*, 355 F.Supp.2d 1182, 1187 (D.Kan. 2005).

In the typical case, it is a defendant's joinder which allegedly defeats diversity. Here, it is a plaintiff who has allegedly been fraudulently joined. Cases in other jurisdictions have held that "the fraudulent joinder doctrine can be applied to the alleged fraudulent joinder of a plaintiff." *Miller v. Home Depot, U.S.A., Inc.*, 199 F.Supp.2d 502, 508 (W.D.La. 2001) (citing

11

*Elk Corp. of Tex. v. Valmet Sandy-Hill, Inc.*, 2000 WL 303637 (N.D.Tex. 2000). *See Lackey v. Atl. Richfield Co.*, 990 F.2d 202, 207 (5th Cir.1993); *Miller v. Giesecke & Devrient America, Inc.*, 2007 WL 518557, 1 -2 (N.D.Tex. 2007) and cases cited therein. This is particularly appropriate where the removed case is a declaratory judgment action. *See, e.g.*, *Hodach v. Caremark Rx, Inc.*, 374 F.Supp.2d 1222, 1225-26 (N.D. Ga. 2005) (concluding that usual fraudulent joinder standard applied to nondiverse plaintiff).

The Tenth Circuit has not clearly defined the contours of the fraudulent joinder doctrine, and has neither confined the doctrine's application to fraudulently joined defendants nor expressly extended it to fraudulently joined plaintiffs. This court believes that in an appropriate case such as this one, the Tenth Circuit would apply the fraudulent joinder doctrine to a non-diverse plaintiff, as there is "no logic in prohibiting plaintiffs from defeating diversity jurisdiction by fraudulently joining nondiverse defendants, but allowing them to do so through fraudulently joining nondiverse plaintiffs." *Grennell v. W.S. Life Ins. Co.*, 298 F.Supp.2d 390, 395-400 (S.D.W.Va. 2004). Additionally, KSU's status as a non-citizen rather than as a non-diverse party does not preclude application of this

doctrine, which merely puts meat on the bones of the test for determining whether a party is nominal or the real party in interest. *See State of Okl. ex rel. Williams v. Oklahoma Natural Gas Corp.,* 83 F.2d 986 (10th Cir. 1936) (finding the state to be a mere nominal party without any substantial interest in the controversy, whose presence as plaintiff did not defeat jurisdiction of the federal court).

To establish that a party was joined fraudulently to defeat diversity, the movant must demonstrate either fraud in the recitation of jurisdictional facts or the absence of any possibility that the party has stated a claim against him in state court. *See Dodd v. Fawcett Publ'ns, Inc.*, 329 F.2d 82, 85 (10th Cir.1964); *Montano v. Allstate Indemnity*, 211 F.3d 1278 (Table), 2000 WL 525592, 1-2 (10th Cir. 2000); *Rodriguez v. Sabatino*, 120 F.3d 589, 591 (5th Cir.1997), *cert. denied*, 523 U.S. 1072 (1998). This is a "heavy burden." *Montano*, 211 F.3d at 1278. In the present case, no fraud in the recitation of jurisdictional facts is alleged. Accordingly,

> [t]o prove their allegation of fraudulent joinder [the removing parties] must demonstrate that there is no possibility that [plaintiff] would be able to establish a cause of action against [the joined party] in state court. In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party. We are then to determine whether that party has any possibility of recovery against the party whose joinder is questioned.

*Montano*, 2000 WL 525592 at *2 (quoting *Hart v. Bayer Corp.*, 199 F.3d 239, 243 (5th Cir. 2000).)

In cases where fraudulent joinder is claimed, the Tenth Circuit has directed courts to "pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available." *Dodd*, 329 F.2d at 85 (citations omitted). The court's examination of affidavits or other matters of record is thus appropriate.

Because this is a declaratory judgment action, the court modifies the traditional application of the fraudulent joinder doctrine by asking whether the plaintiff, here KSU, would be a proper party to defendant's suit on the underlying cause of action.[3] "Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action." *Collin County, Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir.1990). *See*

---

[3]The inquiry is similar to the one imposed by Fed.R.Civ. P.17(a), which requires that "[e]very action shall be prosecuted in the name of the real party in interest." *See Boeing Airplane Co. v. Perry*, 322 F.2d 589 (10th Cir.1963), *cert. denied*, 375 U.S. 984, 84 S.Ct. 516, 591 (1964) (finding that "the 'real party in interest' is the one who, under applicable substantive law, has the legal right to bring the suit."

14

*Astrazeneca AB v. Mutual Pharmaceutical Co., Inc.*, 221 F.Supp.2d 528, 530 (E.D.Pa. 2002). Where a party could not have been sued by the declaratory judgment defendant, it lacks standing to bring a declaratory judgment action against that party. *Collin County*, 915 F.2d at 171. "Parties who lack standing to enforce an agreement also lack standing to seek a declaration of rights under the contract." *Eaton Vance Management v. ForstmannLeff Associates, LLC,* 2006 WL 2331009, 6 (S.D.N.Y. 2006) (citing cases; finding no standing for plaintiffs who sought a declaration that a restrictive covenant entered into between two other parties was unenforceable). Generally, where "the relief requested is the interpretation of a contract to which plaintiff is not a party ... Plaintiff does not having standing to pursue [a] declaratory judgment action." *Premier Pyrotechnics Inc. v. Zambelli Fireworks Mfg. Co.*, 2005 WL 1307682, at *2 (W.D. Mo. 2005).

This approach is consistent with the Kansas Declaratory Judgment Act. *See* KSA § 60-1704; K.S.A. § 60-1712; K.S.A. § 60-1713; *In re Estate of Keller,* 273 Kan. 981, 984-985 (2002). Although the Kansas Declaratory Judgment Act should be liberally applied when the plaintiff has a legal interest in an actual case or controversy, the Act does not allow a stranger

to intended litigation to use a declaratory judgment action as a vehicle to create a cause of action for which it has no legal liability. "Declaratory relief is generally not available to a party unless that party has been in some way injured or aggrieved..." *In re Estate of Keller*, 273 Kan. at 981. A party having only such interest as the public generally has cannot maintain a declaratory judgment action. *Asendorf v. Common School Dist. No. 102 of Sedgwick County*, 175 Kan. 601, 607 (1954). The few Kansas cases which have addressed standing under the Kansas Declaratory Judgment Act illustrate that principle. *See e.g.*, *Robinson v. Kansas State High School Activities Ass'n, Inc.*, 260 Kan. 136 (1996); *Joe Self Chevrolet, Inc. v. Board of County Com'rs of Sedgwick County*, 247 Kan. 625, 629 (1990); *Moody v. Board of County Com'rs,* 237 Kan. 67 (1985).

The court thus looks to the underlying suit brought by the defendants to determine whether KSU would be a proper party to any cause of action stated therein. Defendants' counterclaims on the underlying cause of action are brought under Kansas law for IAC's anticipatory repudiation of the MOU, and fraudulent inducement of Prince to sign the MOU in the event that Krause lacked legal authority to bind the IAC. The counterclaims are

brought solely against IAC.[4] No counterclaims have been brought against

KSU.

In fact, defendants, in their recitation of facts in support of their

counterclaims, expressly disavow any connection between KSU and the

MOU, in stating:

> KSU is not a party to the Memorandum of Understanding and has no
> obligations thereunder. Coach Prince's employment agreements with
> KSU and the respective obligations under the Employment
> Agreements are not at issue in this matter and have all been
> completely performed.

Dk. 4, p. 2. The theme of KSU's lack of involvement in the issues being

litigated is reprised many times throughout defendants' brief in opposition

to the motion to remand. *See e.g.*, Dk. 17, p. 1, n. 2 ("the single contract at

issue does not involve plaintiff, Kansas State University"); *Id.*, p. 9 ("No

party has any remaining obligations under the 2005 Employment

Agreement."); *Id.*, p. 10 ("...the obligations of all parties to the 2008

Extended Contract have been fully performed and satisfied. ...Neither

Coach Prince nor KSU has any additional obligations ... under the

Extended Contract.")*; Id.*, p. 12 ("If the MOU is valid, it is enforceable only

---

[4]IAC responded by moving to dismiss the counterclaims, claiming
Eleventh Amendment immunity. Dk. 13. Thereafter, the parties agreed to
stay briefing on that issue pending the court's resolution of this motion.

17

against the IAC. If the MOU is somehow invalid, the MOU is enforceable against no entity. In neither case will the state of Kansas or KSU be liable for any sum, under the MOU."); *Id.,* p. 12-13 ("There exist no circumstances in which public funds could be used to satisfy the IAC's obligations under the MOU," citing Dk. 14, Exh. 2; K.S.A. § 76-734; K.S.A. § 76-732).  The court finds it immaterial, however, that the defendants have not actually named KSU as a defendant. The determining question is whether KSU is the real party in interest to either cause of action defendants have stated against IAC.

For the sake of simplicity, the court focuses its discussion on the counterclaim for anticipatory repudiation rather than on the counterclaim for fraudulent inducement. "[U]nder Kansas law, anticipatory repudiation is a breach of contract which authorizes the nonbreaching party to bring an immediate action." *Cohen v. Battaglia*, 41 Kan.App.2d 386, 393 (2009), citing *Hawkinson v. Bennett*, 265 Kan. 564, 602 (1998). Kansas law generally recognizes that unless a party has contractual privity, is an intended third-party beneficiary, or is an assignee of a contract, it lacks standing to enforce the terms of an agreement. *See Wade v. EMCASCO Ins. Co.*  483 F.3d 657, 675 (10th Cir. 2007); *State ex rel. Stovall v.*

18

*Reliance Ins. Co.,* 278 Kan. 777, 793, 107 P.3d 1219, 1231 (2005)*; First Nat. Bancshares of Beloit, Inc. v. Geisel,* 853 F.Supp. 1337, 1340 -1342 (D.Kan.1994)*; Noller v. GMC Truck and Coach Div.*, 244 Kan. 612, 772 P.2d 271, 275 (1989); *Professional Lens Plan v. Polaris Leasing Corp.,* 234 Kan. 742, Syl. ¶ 1. 675 P.2d 887 (1984); *Martin v. Edwards*, 219 Kan. 466, 548 P.2d 779, 785 (1976). Here, it is undisputed that KSU is not a party to the MOU, and no argument is made that KSU is an intended beneficiary or assignee of that agreement.

Plaintiffs nonetheless contend that KSU has a legally sufficient "interest" to bring the declaratory judgment action for other reasons. First, KSU states, as an example, that it believed that its $1,200,000 payment to Prince pursuant to the 2008 employment agreement satisfied any obligation with respect to compensation due Prince following his termination. Dk. 19, p. 4-5. This example does not aid KSU in showing it is a proper party. Because defendants concede that KSU's payment to Prince of $1,200,000 pursuant to the 2008 employment agreement satisfied KSU's entire obligation with respect to compensation due Prince following his termination, any declaration by this court on that issue would be moot.

Secondly, plaintiffs contend that KSU has a sufficient interest in the

action because Prince agreed that any modification of his 2005 employment agreement would need to be signed by the President of the University, the Athletic Director and Prince, but the MOU is not signed by KSU's President. The court finds this irrelevant, since the parties agree that the 2005 agreement was replaced and superseded by the 2008 agreement which omitted that requirement.

KSU's next stated reason for its "interest" in this case is that it feared at the time it filed the action that Prince and IPP would attempt to hold KSU liable for IAC's conduct with regard to the MOU under an agency or piercing of the corporate veil theory. KSU states that it had found a "secret email communication" from defendants' then attorney, Neil Cornrich, to University official Bob Krause dated the day before the MOU was signed, thrice referring to the MOU as something "proposed by the University." Dk. 19, p. 5. This too, lacks significance, since a subjective fear of future litigation is insufficient to support standing unless there is a "credible threat of prosecution or other consequences..." *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) (quotation omitted). Further, later events have shown plaintiff's fear to be unfounded. KSU was not, in fact, named as a defendant in Prince's suit.

KSU further contends, however, that IAC is, in fact, an alter ego or instrumentality of the State, specifically, of KSU. The alter ego theory provides yet another means for a breach of contract action to be maintained by or against a non-party to a contract, under Kansas law. *See Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F.Supp.2d 1165, 1169 (D.Kan. 2006) (finding a viable claim for breach of contract against a person who did not sign the MOU but was alleged to be alter agent of a signatory); *Higginson v. Wood,* 24 F.Supp.2d 1217, 1219 (D.Kan.1998). *See generally Sid Richardson Carbon & Gasoline Co. v. Interenergy Resources, Ltd.,* 99 F.3d 746, 752 (5th Cir.1996) (finding piercing of corporate veil could impose liability on non-signatories to contract who otherwise would have been fraudulently joined to defeat diversity); *Audi of Smithtown, Inc. v. Volkswagen of America, Inc.*, 2009 WL 385541, 4 (E.D.N.Y. 2009). The court thus finds it necessary to determine whether IAC may be, as KSU contends, an alter ego or mere instrumentality of KSU, making KSU an arguably proper party to defendants' counterclaim for anticipatory repudiation.

The arm-of-the-state doctrine is traditionally used to bestow sovereign immunity on entities created by state governments that operate

as alter egos or instrumentalities of the states. *Mascheroni v. Board of Regents of the Univ. of Cal.*, 28 F.3d 1554, 1559 (10th Cir.1994). *See Innes*, 184 F.3d at 1278 (finding Kansas State University to be an arm of the state). Whether an entity is an "arm of the State" turns on the entity's function and character as determined by state law. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989). Accordingly, cases from other states are not particularly persuasive, even if they examine the status of a State University's Athletic Association. *See e.g., Braswell v. Board of Regents of University System of Ga.*, 369 F.Supp.2d 1371, 1376 (N.D.Ga. 2005) (finding the University of Georgia Athletic Association entitled to Eleventh Amendment immunity); *Harrick, Jr. v. Board of Regents of the University System of Georgia*, 2006 WL 870311, 3 (N.D.Ga. 2006) (same); *Board of Regents of Regency University System v. Reynard,* 292 Ill.App.3d 968, 977 (Ill.App.1997) (finding Athletic Council of Illinois State University to be a public body which must comply with the Open Meetings Act and FOIA); *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282, 1302 (11th Cir. 2007) (stating in dicta that it would find Eleventh Amendment bars a §1983 suit against the University's Athletic Association).

The test in the Tenth Circuit for determining whether an entity constitutes an "arm of the state" is well established.

> We look to four primary factors in determining whether an entity constitutes an "arm of the state." *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. 568. First, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. *See Sturdevant*, 218 F.3d at 1164, 1166. Second, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. *See id.* at 1162, 1164, 1166. Third, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. *See id.* Fourth, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose. *See id.* at 1166, 1168-69.

*Steadfast Ins. Co. v. Agricultural Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007). *See Watson v. University of Utah Medical Center*, 75 F.3d 569, 577 (10th Cir. 1996) (applying similar factors in finding the University of Utah Medical Center to be an arm of the state entitled to Eleventh Amendment immunity).

Although this test is applied most frequently in determining the applicability of Eleventh Amendment immunity, it is equally applicable in determining one's citizenship for the purpose of diversity jurisdiction, where the crucial question is whether the State is the real party in interest. *See*

*Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255, 260-61 (4th Cir. 2005) and cases cited therein; *N.E. Fed. Credit Union v. Neves*, 837 F.2d 531, 534 (1st Cir.1988) (tests "pretty much the same"); *Coastal Petroleum Co. v. U.S.S. Agri-Chems.*, 695 F.2d 1314, 1318 (11th Cir.1983) (analysis is "the same"); *Tradigrain, Inc. v. Mississippi State Port Auth.*, 701 F.2d 1131, 1132 (5th Cir.1983) (analysis is "virtually identical"). *See also Kansas Public Employees Retirement System v. Boatmen's First Nat. Bank of Kansas City*, 982 F.Supp. 806, 809 (D.Kan.,1997) (applying Eleventh Amendment test to find that KPERS is an alter ego of the state of Kansas, and, therefore, is not a "citizen" for the purposes of diversity jurisdiction pursuant to 28 U.S.C. § 1332). "Whether in the diversity or the immunity context, the analysis must center on the State-related party's enduring legal identity as a juridical entity separate from the State." *University of Rhode Island v. A.W. Chesterton Co.,* 2 F.3d 1200, 1203 (1st Cir. 1993).

The Tenth Circuit has used the arm-of-the-state analysis to resolve issues other than the Eleventh Amendment. *See e.g.*, *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 718 (10th Cir. 2006) (finding that a laboratory owned by a state university is not an arm of the state so is a "person" who may be sued under the False Claims Act);

*Kansas Turnpike Authority v. Abramson*, 275 F.2d 711 (10th Cir. 1960) (finding the Kansas Turnpike Authority was not an arm of the State, and the State, who would be a diversity defeating defendant, was not the real party in interest), *cert. denied*, 363 U.S. 813 (1960). Additionally, although these factors appear to be designed to discriminate between governmental bodies rather than to determine whether arguably private entities are arms of the state, the Tenth Circuit in *Sikkenga* applied the Eleventh Amendment arm of the state analysis to a corporation. 472 F.3d at 718. Accordingly, believing that the arm of the state analysis is appropriate, the court examines the precise nature of IAC by applying the four *Steadfast* factors to the facts.

### State law

The court first ascertains the character ascribed to IAC under state law. In addressing this factor, "a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." *Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir.1996), *cert. denied*, 521 U.S. 1120 (1997).

IAC is a not for profit 501(c)(3) corporation whose principal place of business is in Kansas. Dk. 17, Exh. 1- 3. Kansas law vests it with those

powers common to corporations, including the power to sue and be sued. *See* Kan.Const. Art. 12, § 6; KSA § 17-6102.  Defendants rely heavily upon the law that for purposes of diversity jurisdiction, a corporation shall be deemed to be a citizen of any State by which it has been incorporated, *see* 28 U.S.C. § 1332(c)(1), but this principle is subject to the arm of the state exception. *See Moor*, 411 U.S. 717-718; *Yancoskie v. Delaware River Port Authority*, 528 F.2d 722, 727 (3d Cir. 1975). The "formal incorporation of a State-related entity is not necessarily dispositive on the issue of its autonomy, either for immunity or diversity purposes..." *University of Rhode Island*, 2 F.3d at 1204.

Kansas statutes do not mention IAC by name or designate it as a State agency. A Kansas statute does, however, authorize KSU to substantially control a state agency or a private corporation with which it contracts for a purpose related to its operation or function. Here, that entity is IAC. The statute provides:

> The board of regents, or any state educational institution with the approval of the board of regents, may enter into contracts with any party... including...any agency of ... any state or with any ... corporation if the purpose of such contract is related to the operation or function of such board or institution. If such contract is with a corporation whose operations are substantially controlled by the board or any state educational institution, such contract shall provide that the books and records of such corporation shall be public

records and shall require an annual audit...

KSA §76-721. The legislature thus contemplated that a State University could "substantially control" a corporation whose purpose is related to the university's function.

A review of decisional law shows that the Kansas Supreme Court found IAC to be an instrumentality of the State of Kansas in *Shriver v. Athletic Council of Kansas State Univ.*, 222 Kan. 216, 219 (1977). Plaintiffs argue that *Shriver* is dispositive of the present issue. This court will give deference to decisions rendered by the state's highest court on matters of state law, but does not find such decisions to be dispositive. *Steadfast*, 507 F.3d at 1253; *Duke v. Grady Mun. Schools*, 127 F.3d 972, 978 (10th Cir. 1997); *Brennan v. University of Kansas*, 451 F.2d 1287, 1290 (10th Cir.1971). The "real party in interest" analysis is ultimately a matter of federal law. *See Moor*, 411 U.S. at 720, 93 S.Ct. at 1801. Nonetheless, "that federal question can be answered only after considering the provisions of state law that define the agency's character." *Regents of the Univ. of California v. Doe*, 519 U.S. 425 n. 5, 429 (1997).

In *Shriver,* the Kansas Supreme Court examined three controlling documents: 1) the contract between KSU and the IAC (which is quite

similar to the present contract between those entities); 2) affidavits submitted by the IAC regarding its function, operation, and membership; and, 3) the Constitution of KSU's Faculty Senate. At that time, unlike at the present, the IAC operated as a standing committee of KSU's Faculty Senate. The court did not mention or analyze IAC's by-laws, although IAC was stated to be a corporation. The Court held:

> The Athletic Council is thus completely dominated by and is operated as an integral part of the University. In fulfilling the duties entrusted to it, and in its every activity and function, it is subject to the policy and control of the University. We conclude that the Athletic Council is an instrumentality of Kansas State University. As such, it shares in the governmental immunity mandated by the legislature through K.S.A. 46-901.

222 Kan. at 219.

This court does not find *Shriver* to be controlling because the IAC had a different organizational structure then (as discussed below), the Kansas Supreme Court did not analyze IAC's current by-laws, and the Court focused solely on the factor of autonomy instead of applying the multi-factored test which govern this court's decision. *Shriver* is nonetheless persuasive regarding the facts the Court did discuss which remain constant.

A similar approach was used to find the Physical Education

Corporation of Wichita State University to be the corporate agent and mere instrumentality of WSU in *Brown v. Wichita State Univ.*, 217 Kan. 279, 288-89 (1975), *vacated in part on other grounds by* 219 Kan. 2, 547 P.2d 1015 (1976). The court found that the acts of the Physical Education Corporation were, therefore, the acts of the University. *Brown v. Wichita State University, PEC, Inc.,* 217 Kan. 661, 663, 538 P.2d 713, 716 (1975).

In reliance on *Shriver*, a later Kansas Supreme Court case held, without analysis, that the Wichita State University Intercollegiate Athletic Association, Inc. is an integral part of WSU, as it is controlled and operated by WSU's employees and enjoys the same privileges as WSU. *Gragg v. Wichita State University*, 261 Kan. 1037, 1058, 934 P.2d 121, 136 (1997) (finding WSU's Athletic Association to be a governmental entity under K.S.A.1996 Supp. 75-6102 (c), entitled to immunity from liability under the Kansas Tort Claims Act).

The Kansas Attorney General has not examined IAC, but has opined that Kansas University's Athletic Corporation is a corporation whose operations are substantially controlled by Kansas University, *see* Kan. Att'y Gen. Op. No. 80–118 (finding K.S.A. 76–721 applicable). In contrast, Kansas A.G. opinions have noted that the Endowment Associations of

Kansas and Wichita Universities are not substantially controlled by those entities. *See* Kan. Att'y Gen. Op. No. 80–239 (opining that K.S.A. 76–721 is inapplicable to Kansas University's Endowment Association); Kan. Att'y Gen. Op. 82- 172, 1982 WL 187662, 5 -6 (opining that the WSU Endowment Association is not subject to either K.S.A. 45–201 et seq., or K.S.A. 76–721). The court gives these opinions little weight since none examines IAC, and the applicable test is extremely fact-specific.

Under Kansas statutes, IAC is a corporation whose operations are substantially controlled by KSU. Despite the fact that IAC may have a different organizational structure today than it when *Shriver* was decided, the court finds that on balance, state law favors finding IAC to be an arm of the State.

### Autonomous v. dependent nature

The court next assesses the extent of the State of Kansas's control over IAC. In determining whether IAC is dependent or autonomous, the court examines IAC's charter, its contract with KSU, its by-laws, and affidavits properly submitted to the court.

IAC's charter, dating back to 1933, states that it is a not for profit corporation whose purpose is "supervision of intercollegiate athletic

activities at Kansas State College." Dk. 19, Exh. 1. IAC's activities thus
benefit KSU, as it is performing a task that KSU would otherwise have to
perform itself.

The contract between KSU and IAC provides that KSU grants to IAC
the exclusive right to operate its intercollegiate athletic program:

> [KSU] agrees to grant IAC exclusive rights, as indicated in Article 3
> below, to maintain and operate an intercollegiate athletic program
> located on land owned or controlled by the University in accordance
> with the rules and regulations of the University.

In Article 3 of the contract between KSU and IAC, referenced above,
the parties agree as follows:

> A. IAC will be operated as a department of the University and
> be subject to the regulations and administrative policies of the
> University.
> B. The University agrees to allow IAC the right to maintain and
> operate an intercollegiate athletic program located on land owned or
> controlled by the University.
> C. The University agrees to furnish the same police and fire
> protection for IAC facilities located on the University campus proper
> as are furnished other campus proper facilities.
> D. IAC agrees to provide management and operational services
> for operating an intercollegiate athletic program and to collect and
> disburse the funds heretofore or hereafter subscribed.

Dk. 19, Exh. 2, p. 2.

Remaining provisions of the contract between KSU and IAC permit
IAC's deposit of revenue in "special accounts," establish that all IAC's

31

books and records shall be public records and shall be audited annually, and provide a "Disclaimer of liability." But for the disclaimer of liability, addressed below, this agreement is very similar to the agreement between the IAC and KSU recited in *Shriver*, which the Kansas Supreme Court relied on in finding IAC to be an instrumentality of the State.

The agreement between KSU and IAC shows that IAC is subject to the rules, regulations, and administrative policies of KSU, and is not free to fashion and follow its own rules or policies to the extent they may conflict with those of KSU. That IAC is operated as a department of the University is also significant in showing its lack of autonomy.

IAC's by-laws in effect at the time the MOU was executed state its corporate objective as:

> ...to promote and support intercollegiate athletics allowing [KSU] to compete as strongly as possible, within the resources available to the University and the [governing]  rules and regulations.

Dk. 19 Exh. 3, p. 1. IAC's purposes are separately stated:

> The Council shall consider questions of policy relating to intercollegiate athletics and shall submit its recommendations to the Director of Athletics. These areas of concern shall include but not be restricted to budgetary and financial matters, use of facilities, promotional activities, equal opportunity for all student athletes, academic progress of student athletes and personal conduct of student athletes and employees of the Department of Athletics.
> The Council may initiate topics for discussion and may consider

any questions of policy as referred to it from faculty, alumni, students or friends of the University. In particular, the Council shall consider the annual budget as prepared by the Director of Athletics and give its reactions and advice to the Director. ...

Administration of policy shall be the responsibility of the Director of Athletics. The Council shall serve in an advisory capacity to the Director of Athletics concerning appointment or reappointment of administrative personnel within the Department of Athletics.

Dk. 19, Exh. 3.

The by-laws establish the following voting members of IAC: a Chairperson (faculty member or University administrator) who is appointed by and serves at the will and pleasure of the President of KSU; two alumni members; two student members; two faculty-at-large members; one faculty representative to the NCAA and Big 12 Conference; and one alternate faculty member. The President of KSU selects or appoints each member, some after advisement with or nominations from other entities. The Director of Athletics of KSU serves as the President of IAC and is a non-voting member, also appointed by the President of KSU. The President of KSU has the option of appointing two additional non-voting members. Some members serve for a fixed term of two or three years, while others, including IAC's President and IAC's Chairperson, serve a term whose length is designated by the President of KSU. The President of KSU alone has the right to remove a member of IAC, for stated reasons.

"The power of appointment (and reappointment) is significant, and may entail risks of subtle or indirect manipulation of the entity's decisionmaking processes..." *University of Rhode Island,* 2 F.3d at 1207. See *Maryland Stadium Authority*, 407 F.3d at 264 ("The fact that all of the University's decisionmakers are appointed by the Governor is a key indicator of state control") and cases cited therein. *But see University of Rhode Island*, 2 F.3d at 1207-08 (discounting importance of appointment power where members were given staggered terms and minimal compensation in order to minimize state control). That all of IAC's decisionmakers are appointed and may be removed solely by KSU's President, that few if any terms are staggered, and that many members have no term limits, point toward state control.

IAC's by-laws empower the President of IAC to enter into contracts on behalf of IAC and to contract certain short-term loans or leases, consistent with the needs and objectives of IAC. The power to contract is indicative of "self-determination typically held by distinct juridical entities," *University of Rhode Island*, 2 F.3d at 1207, but here that independence is curtailed by the fact that only KSU's Director of Athletics in his capacity as IAC's President is so empowered.

Minutes of all IAC meetings are to be sent to its members and to KSU's President. IAC's by-laws may be amended, repealed, or altered only upon final approval by KSU's President and Director of Athletics. Dk. 19, Exh. 3. These by-laws demonstrate that although KSU may lack veto power over IAC's daily decisions, KSU's President controls the membership of IAC, and the content of its by-laws. KSU's Director of Athletics, by virtue of his position as President of IAC, controls its contracts and thus ultimately directs IAC's day-to-day activities.

An affidavit submitted by KSU's long-time General Counsel asserts the following additional facts: IAC's funds are handled and administered by KSU fiscal offices and are kept in KSU's bank accounts; IAC's budget is prepared according to the same standards as used by other KSU departments and is subject to the KSU President's approval; IAC's personnel policies and human resource/payroll functions area administered by KSU; IAC is subject to the general administrative control of KSU; IAC is described as an instrumentality of KSU by KSU; IAC's records are maintained in accordance with the Kansas Open Records Act; IAC's meetings are conducted in accordance with the Kansas Open Meetings Act; and, IAC's employee benefit plan has consistently been treated as

exempt from ERISA's coverage as a "governmental plan." Unlike in *Shriver*, no contention is made that IAC's salary levels follow the same criteria as those in other departments of the University. *See* 222 Kan. at 218.

The court finds that although IAC retains some operational independence in its day to day activities, it is still closely tied to KSU, as further evidenced by the fact that IAC is represented in this case by KSU's Associate General Counsel. The record shows that the State of Kansas, through KSU, exercises significant supervision and control over IAC's internal and external affairs, rendering IAC far from autonomous. This lack of autonomy points toward arm of the state status.

### IAC's finances

The parties agree that IAC lacks taxing authority, but do not address whether it receives any state funding or has the ability to issue bonds. IAC's tax return from 2007 (form 990)[5] indicates that it received $11,314,878.00 in "direct public support," $36,337,192.00 from "event tickets, Big 12/NCAA surplus, radio and TV contracts, and other revenue," and $555,856 in interest. Dk. 17, Exh. 3. IAC's funds appear to be largely,

---

[5]No other tax returns or similar information is included in the record.

if not entirely, "nonpublic moneys" which are not part of the state treasury. *See* K.S.A. § 76-732 (authorizing the establishment of an "organizational safekeeping account" which shall have credited thereto the "nonpublic moneys of any organization related to [a] state educational institution" which requests in writing the safekeeping of its funds by such institution. "Moneys of any organizational safekeeping account shall not be in or a part of the state treasury but shall be subject to post audit...") The Kansas Supreme Court in *Shriver* found that "athletic funds-such as those of the Athletic Council .... are not a part of the state treasury. K.S.A. 1976 Supp. 76-732." 222 Kan. at 221. It would appear from the MOU and from the amount of revenue reflected in IAC's tax return that IAC injects funds into KSU or KSU's employees, rather than draining funds from it. That IAC has independent fundraising ability cuts against its being an arm of the state.

Further, the record is very clear on the question whether a judgment against IAC would be paid from the state's treasury. *See generally Sturdevant v. Paulsen*, 218 F.3d 1160, 1166 (10th Cir. 2000). The Kansas legislature has answered this question with a resounding, "No." The immunity of public funds for IAC debts is required by K.S.A. § 76-734, which states: "The state of Kansas and its agencies, institutions, officers

37

and employees shall not be liable for the debts, obligations or liabilities of any organization for which a function under this act is performed." "This act" refers to the act related to the management and operation of state educational institutions. By the plain language of this statute, neither the State of Kansas nor KSU can be liable for IAC's debts. Contrary to defendants' assertions, this statute predated *Shriver*. *See Shriver*, 222 Kan. at 221 (finding "the state is not liable for the obligations of the Council. K.S.A. 1976 Supp. 76-734.")

The agreement between KSU and IAC contains two sections in apparent compliance with the above statutes. The first provides that IAC may deposit its revenue in "special accounts" with KSU, and that all IAC's books and records shall be public records, audited annually. The second is its final paragraph captioned "Disclaimer of Liability," which states: "Neither the State of Kansas nor the University shall hold harmless nor indemnify IAC for any liability whatsoever ..." Dk.19, Exh. 2, p. 13.

In light of the stated statutory immunity and contractual immunity of the State of Kansas and KSU for IAC's "debts, obligations or liabilities," no reasonable possibility has been shown that funds to satisfy a money judgment against IAC would come from the State of Kansas or from KSU.

This factor weighs clearly in favor of finding that IAC is not an instrumentality of the state.

Defendants contend that this factor is largely dispositive of the analysis. The court disagrees. "[T]he absence of legal liability is not determinative." *Sikkenga*, 472 F.3d at 718 (finding state statute's prohibition on any judgment against entity being satisfied out of the State's treasury or general funds appropriated for the operation of the University not determinative of arm of state analysis); *see Sturdevant v. Paulsen,* 218 F.3d 1160, 1166 (10th Cir. 2000); *Duke*, 127 F.3d at 978. In reviewing the status of an entity under § 1332, "this concern with protecting the state treasury is not as relevant....Thus in contrast to cases involving an entity's entitlement to Eleventh Amendment immunity, the effect of the action on the state treasury will not be controlling." *Maryland Stadium Authority*, 407 F.3d at 262. The financial factor clearly weighs against IAC's being an arm of the state.

### State or local concern

Lastly, the court considers whether IAC is concerned primarily with local or state affairs.[6] Once again the court looks to IAC's governing

_____

[6]The court questions the weight to give this factor, believing that its chief value lies in discriminating between governmental bodies rather than

39

documents. As noted above, the subject matter of IAC's concern is broader than the mere conduct of sporting events, and includes budgetary and financial matters, use of facilities, promotional activities, equal opportunity for student athletes, academic progress of student athletes, and personal conduct of student athletes and employees of KSU's Department of Athletics. These areas echo those which are traditionally of concern to a state's post-secondary educational institution and are not merely local in nature. *See Maryland Stadium Authority*, 407 F.3d at 265 (finding higher education to be "an area of quintessential state concern and a traditional state governmental function"), and cases cited therein. Similarly, the scope of the policy questions that IAC may consider- questions of policy as referred to it from faculty, alumni, students of friends of KSU - is broad, both in the persons and in the geographic area served.

Additionally, the Kansas Supreme Court has taken judicial notice that "intercollegiate football is 'big business.' " *Brown*, 217 Kan. at 307. This court is convinced that the supervision, maintenance and operation of intercollegiate athletic activities at KSU, which is part of the Big 12 college athletic conference, is not primarily concerned with local matters. This

_____

in determining whether an allegedly private corporation is an arm of the state.

factor thus points toward arm of the state status for IAC.

### Conclusion

The factors above point different directions. In Eleventh Amendment cases, "[w]hen indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide." *Hess v. Port Auth. Trans-Hudson, Corp.*, 513 U.S. 30, 47, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). Those twin reasons are that federal court judgments not deplete the state treasury, and that the "dignity" of the states be preserved. *Id.* Here, however, these twin reasons suggest opposite conclusions, as the state's lack of liability for IAC's debts favors autonomy, while the treatment of IAC by the state court favors arm of the state status. In short, the balance of factors creates jurisdictional doubt.

In this case, it makes little sense for the court's prime guide to be anything other than the principles of federalism underlying the court's diversity jurisdiction. *See Bradbury v. Dennis*, 310 F.2d 73, 76 (10th Cir.1962). Mindful that federal removal jurisdiction is to be strictly construed, and that jurisdictional doubt must be resolved in favor of remand, the court cannot say as a matter of law that there is no justiciable controversy between the defendants and KSU that could be resolved by

41

the declaratory judgment action. Otherwise stated, the facts establish the possible viability of an anticipatory repudiation claim by the defendants against KSU based on IAC's status as an agent, arm of the state or instrumentality of KSU. The court does not find that IAC is, in fact, an arm of the state, but instead finds that it may be, yielding a reasonable basis for at least one colorable claim by the defendants against KSU. *See Dodd*, 329 F.2d at 85 (finding the federal court should not pre-try doubtful issues of fact to determine removability; rather the issue must be capable of summary determination and must be proven with complete certainty.) Accordingly, the Court need not examine defendants' second counterclaim for fraudulent inducement.[7]

Because KSU's presence in this declaratory judgment case is as a real party in interest, rather than as a fraudulently joined party, its citizenship cannot be overlooked. Instead, its presence as a non-citizen destroys any possibility of diversity of citizenship of the parties, precludes this court from obtaining subject matter jurisdiction, and compels this court

---

[7]Remand is required if any one of the claims against a non-diverse plaintiff is possibly viable. *Montano*, 211 F.3d at *2, citing *Green v. Amerada Hess Corp.*, 707 F.2d 201, 207 (5th Cir.1983), *cert. denied*, 464 U.S. 1039 (1984).

to remand the case to state court.

It is unnecessary for this court to examine the citizenship of the other parties, thus the court does not reach the question whether IAC is in fact an arm or instrumentality of the State of Kansas whose presence alone would divest the court of jurisdiction. The court notes that this jurisdictional decision in no way reflects the Court's opinion as to the merits of any claim, the applicability of immunity, or the viability of any defense alleged by any party. Where the removing defendant fails to establish a basis for diversity jurisdiction, the Court must remand the case to state court without ruling further on the matter. *See Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005).

**Costs and expenses**

Plaintiffs request an award of their costs and expenses incurred as a result of the improper removal. Under the relevant statute, "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of removal." 28 U.S.C. § 1447(c), The standard for awarding fees depends on the reasonableness of the removal.

> Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively

reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied.

*Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141, 126 S.Ct. 704, 163 L.Ed.2d 547 (2005).

The court denies the motion for costs and expenses, finding that the question of the propriety of removal was justiciable. This case was unusual in various respects, including its procedural posture as a removed declaratory judgment action, and the lack of Tenth Circuit precedent applying the fraudulent joinder doctrine in this context. Under these circumstances, the plaintiffs have failed to show that defendants lacked an objectively reasonable basis for seeking removal.

IT IS THEREFORE ORDERED that the plaintiffs' motion to remand (Dk. 8) is granted and that the plaintiff's request for an award of their costs and expenses is denied. The case is remanded to the Clerk of the District Court for Riley County, Kansas.

Dated this 8th day of December, 2009.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge